## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| Bank of Hope, as successor to BBCN Bank, | |
| Plaintiff, | Case No. 22-cv-5065 |
| v. | |
| | Honorable _____ |
| Micha Lee, The Estate of Kyuwon Lee, United States Small Business Association, Unknown Owners, Unknown Occupants, and Non-Record Claimants | Property: 984 Lee Street Des Plaines, Illinois 60016 |
| Defendant(s). | |

## COMPLAINT TO FORECLOSE MORTGAGE
## AND FOR OTHER RELIEF

NOW COMES Bank of Hope ("Plaintiff"), by and through its attorneys, Ashen Law Group, and for its Complaint against Micha Lee, The Estate of Kyuwon Lee, United States Small Business Association, Unknown Owners, Unknown Occupants and Non-Record Claimants (collectively, "Defendants"), and states as follows:

1.    Bank of Hope is a California-state chartered banking association organized under the laws of the State of California and maintains its headquarters in Los Angeles, California. On August 13, 2013, the Comptroller of Currency certified the merger of Foster Bank and BBCN Bank. On or about July 29, 2016, an Agreement of Bank Merger was executed, whereby BBCN Bank and Wilshire Bank merged to create Bank of Hope. True and correct copies of the bank succession documents are attached hereto as **Exhibit A**.

2.    This Court has original subject matter jurisdiction in the above-captioned case pursuant to 28 U.S.C. 1332(a) because the matter in controversy is between citizens of different states and the damages claimed exceed the sum of $75,000.00, exclusive of interests and costs.

1

3.      This Court has personal jurisdiction over each Defendant pursuant to 735 ILCS 5/2-209(a) and (b).

4.      Venue is proper in this district pursuant to 28 U.S.C. 1391(b).

5.      Micha Lee ("Borrower-1") is a citizen of the state of Illinois and was at all times referenced in this complaint a resident of the state of Illinois.

6.      Kyuwon Lee ("Borrower-2") is a deceased individual who was a citizen of the state of Illinois and was at all times relevant a resident of the state of Illinois.  (Borrower-1 and Borrower-2 shall be collectively referred to as Borrowers).

7.      Unknown Owners are made defendants pursuant to 735 ILCS § 5/15-1501(c) and 735 ILCS § 5/2-413.

8.      Unknown Tenants are made defendants pursuant to 735 ILCS 5/15-1501(b).

9.      Non-Record Claimants are made defendants pursuant to 735 ILCS § 5/15-1502.

## FACTS COMMON TO ALL COUNTS

10.      On February 27, 2012, Borrower-1, Borrower-2, Illinois Carpet & Drapery, executed a Promissory Note in the amount of $950,000.00 (the "Note") in favor of Plaintiff. A true and correct copy of the Note is attached hereto as **Exhibit B**.

11.      On February 27, 2012, to induce Plaintiff to enter into the Note, Borrower executed a mortgage between Borrower and Plaintiff (the "Mortgage") in favor of Plaintiff on the income producing property commonly known as 984 Lee Street, Des Plaines, Illinois 60016 (the "Property"), and assignment of rents dated February 27, 2012 ("Assignment of Rents"), which encumber the Property to date. A true and correct copy of the Mortgage and Assignment of Rents dated February 27, 2012 are attached hereto collectively as **Exhibit C**.

## COUNT I
## MORTGAGE FORECLOSURE

12.     Plaintiff files this Count to foreclose the Mortgage that it holds on the Property and

joins Micha Lee, The Estate of Kyuwon Lee, United States Small Business Association, Unknown

Owners, Unknown Occupants and Non-Record Claimants as the Defendants.

13.     Plaintiff re-alleges and restates paragraphs 1-10 as if stated herein.

| | | |
|---|---|---|
| a. | Nature of instrument: | Mortgage |
| b. | Date of Mortgage: | February 27, 2012 |
| c. | Name of mortgagor(s): | Micha Lee and Kyuwon Lee |
| d. | Name of mortgagee: | Bank of Hope, as successor to BBCN Bank |
| e. | Date, place and Identification of recording | The Mortgage was recorded with the Cook County Recorder of Deeds on March 14, 2012. |
| f. | Identification of recording | Document No. 1207416057 |
| g. | Interest subject to mortgage | 100% fee simple |
| h. | Amount of original indebtedness, including subsequent advances made under Mortgage: | $950,000.00 |
| i. | Both the legal description of mortgaged real estate and the common address or other information sufficient to identify it with reasonable certainty | Commonly known as: 984 Lee Street, Des Plaines, Illinois 60016<br><br>Permanent Identification Nos.: 09-20-203-016-0000; 09-20-203-017-0000; 09-20-203-018-0000; 09-20-203-031-0000<br><br>Legal Description:<br>PARCEL 1:<br>LOT 7 IN BLOCK 5 IN PARSON AND LEE'S ADDITION TO DES PLAINES, BEING A SUBDIVISION OF THE NORTHEAST 1/4 OF SECTION 20, TOWNSHIP 41 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL |

| | |
|---|---|
| | MERIDIAN, IN COOK COUNTY, ILLINOIS. |
| | PARCEL 2: LOT 1 IN HARD ROCK SUBDIVISION, BEING A SUBDIVISION OF THE SOUTHERLY 50 FEET OF LOT 5 AND ALL OF LOT 6 IN BLOCK 5 IN PARSON AND LEE'S ADDITION TO DES PLAINES, BEING A SUBDIVISION OF THE NORTHEAST 1/4 OF SECTION 20, TOWNSHIP 41 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED AUGUST 15, 2002 AS DOCUMENT NUMBER 0020897803, IN COOK COUNTY, ILLINOIS. |
| j. Statements as to default: | • Failure to make the monthly payment of principal, interest and escrow due under the Loan Documents on November 27, 2021, and each month thereafter<br>• Death of Kyuwon Lee<br>• Failure to maintain the Property in good condition and make all repairs that are reasonably necessary<br>• Allowance of waste, impairment and deterioration of the Property<br>• Failure to maintain real estate taxes for the Property |
| k. Statement as to unpaid principal, interest, other charges and total accelerated amount | Principal $471,419.56<br>Interest to 9/16/22: $26,414.19<br>Appraisal: $3,750.00<br>Late Charges $5,241.16<br>Environmental $27,000.00<br>**Total** $533,824.91<br><br>*Per diem interest $98.21 |
| l. Name of present owner of the real estate: | Micha Lee |

| | | |
|---|---|---|
| m. | Names of defendants claimed to be personally liable for deficiency, if any: | Micha Lee and The Estate of Kyuwon Lee |
| n. | Names of other persons who are joined as defendants and whose interest in or lien on the mortgaged real estate is sought to be terminated | In addition to the persons designated by name herein, there are or may be other persons who are or may be interested in this action, and who have or claimed some right, title, interest or lien in, to or upon the real estate or some part thereof, and the name of such other person or persons so interested in this action is unknown to Plaintiff, and upon diligent inquiry cannot be ascertained, but whose interest is in all respect inferior, subject and subordinate to the lien of Plaintiff's mortgages herein sought to be foreclosed, and such other parties are herby made parties Defendants to this action by the name and description of "Unknown Owners" and "Non-Record Claimants." |
| o. | Capacity in which plaintiff brings this foreclosure | Plaintiff is the legal holder of the Mortgage. |
| p. | Facts in support of request for attorneys' fees and of costs and expenses: | Pursuant to ¶ 16 of the Mortgage, Plaintiff shall be entitled to collect all expenses incurred in pursuing the remedies provided in the Mortgage, including all reasonable attorneys' fees and costs. |
| q. | The names of defendants whose rights to possess the mortgaged real estate after the confirmation of a foreclosure sale is sought to be terminated: | Micha Lee |
| r. | Facts in Support of a shortened or waived redemption: | The right of redemption was waived in ¶ 25 of the Mortgage. |
| s. | Facts in Support of a shortened reinstatement period; or that the right of reinstatement was waived: | The right of reinstatement was waived in ¶ 25 of the Mortgage. |
| t. | Facts in support of a request for appointment of mortgagee in possession or appointment of a receiver: | Plaintiff reserves its right pursuant to the Mortgage to be placed as a mortgagee in possession or have a receiver appointed later. |

## COUNT II - BREACH OF NOTE

14.     Plaintiff re-alleges and re-states paragraphs 1 through 13 as though set forth fully herein.

15.     On February 27, 2012, Borrowers executed the Note in favor of Plaintiff in the original amount of $950,000.00.

16.     Plaintiff is the holder and owner of the Note. Plaintiff has performed all the obligations on its part to be performed under the Note.

17.     Borrowers are in breach of the Note, having failed to payment due November 27, 2021, and all subsequent payments. There is due from the Borrowers, as of September 16, 2022 in the amount of $533,824.91 which includes unpaid principal, interest, late fees and costs.

18.     Interest continues to accrue after September 16, 2022 at the rate of $98.21 per day.

19.     Plaintiff has demanded that Borrowers fulfill their obligations under the Note; however, Borrowers have refused, and continues to refuse, to fulfill their obligations under the Note.

20.     The Note states that Borrowers shall pay all court costs and attorneys' fees in the event of a default under the Note to Plaintiff in collecting the sums owed.

WHEREFORE, Plaintiff, Bank of Hope, requests from this Court (i) a judgment to foreclose and sale, (ii) a personal judgment for a deficiency (iii) an order granting possession, if sought, (iv) a judgment for attorneys' fees, costs, and expenses, (v) an order granting or waiving the redemption period, (vi) an order placing the Mortgagee in possession or appointing a receiver, if sought, (vii) such other relief as this court may deem just and equitable.

Respectfully submitted,

Ashen Law Group
217 N. Jefferson Street, Suite 601
Chicago, IL 60661
(312) 655-0800
ARDC: 6335936
bgipson@ashenlaw.com

By:     /s/ Brian Gipson
        **Brian Gipson, Esq.**
        Attorney for Bank of Hope

# <u>Exhibit A</u>

,. APPROVED
July 30, 2013
Jan Lynn Owen
Commissioner of
Business Oversight

By *Wallace M. Wong* /
Wallace M. Wong
Senior Counsel

FILED
12:02 n.m. Pacific Time August 13, 2013
Jan Lynn Owen
Commissioner of Business Oversight
State of California

By *William Wong*
Wallace M. Wong
Senior Counsel

A074420-8

FILED
Secretary of State
State of California

AUG 0 7 2013

3 u

*1338540 SUN*

## AGREEMENT OF BANK MERGER

This AGREEMENT OF BANK MERGER, dated as of July 24, 2013 (this "Bank Merger Agreement"), is entered into between BBCN Bank, ("Acquirer Bank"), a California state-chartered bank and a wholly-owned subsidiary of BBCN Bancorp, Inc., a Delaware corporation ("BBCN"), and Foster Bank ("Target Bank"), an Illinois state-chartered commercial bank and a wholly owned subsidiary of Foster Bankshares, Inc., a Delaware corporation ("Foster"). Acquirer Bank and Target Bank are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

WHEREAS, BBCN, Won Merger Sub Corp., a Delaware corporation ("Merger Sub"), and Foster entered into an Agreement and Plan of Merger, dated as of April 15, 2013 (the "Holding Company Merger Agreement"), providing, among other things, for the merger of Merger Sub with and into Foster (the "Merger");

WHEREAS, in connection with the Merger, BBCN and Foster desire to merge Target Bank with and into Acquirer Bank (the "Bank Merger") concurrently with or as soon as reasonably practicable after the consummation of the Merger upon the terms and subject to the conditions set forth in this Bank Merger Agreement and the Holding Company Merger Agreement; and

WHEREAS, the Parties intend that for federal income tax purposes the Bank Merger shall qualify as a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and that this Bank Merger Agreement shall constitute a "plan of reorganization" for purposes of Sections 354 and 361 of the Code;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Bank Merger Agreement and the Holding Company Merger Agreement, subject to the conditions set forth in this Bank Merger Agreement and the Holding Company Merger Agreement, and intending to be legally bound hereby, the Parties agree as follows:

1.    Effective Time. Upon the terms and subject to the conditions set forth in this Bank Merger Agreement and the Holding Company Merger Agreement, concurrently with or as soon as reasonably practicable after the consummation of the Merger, Acquirer Bank and Target Bank shall cause the Bank Merger to be consummated by (i) filing a copy of this Bank Merger Agreement, certified by the Secretary of State of the State of California pursuant to Section 1103 of the California General Corporation Law (the "CGCL"), with the Department of Business Oversight of the State of California pursuant to Section 4887 of the California Financial Code and (ii) filing a copy of this Bank Merger Agreement, together with all other required documents and information, pursuant to Chapter 205, Section 5/24 of the Illinois Compiled Statutes (the "ILCS") with the Illinois Department of Financial and Professional Regulation. The Bank Merger shall become effective as provided in Section 4887 of the California Financial Code (the "Effective Time").

2.     The Merger. Acquirer Bank shall be the surviving bank in the Bank Merger (the "Surviving Bank").  At the Effective Time, Target Bank shall be merged with and into Acquirer Bank and the separate existence of Target Bank shall cease.  The Bank Merger shall be governed by, and shall have the effects set forth in, the CGCL and the ILCS.

3.     Effects of the Merger.

(a)     At the Effective Time, the Surviving Bank shall succeed, without other transfer, to all the rights and properties, and shall be subject to all the debts and liabilities, of Target Bank, and the separate existence of Acquirer Bank, with all its purposes, objects, rights, powers, privileges, liabilities, obligations and franchises, shall continue unaffected and unimpaired by the Bank Merger.

(b)     The articles of incorporation (as amended effective as of the Effective Time to reflect the new name of the Surviving Bank) and the bylaws of Acquirer Bank, as in effect as of the Effective Time, shall be the articles of incorporation and bylaws of the Surviving Bank, until thereafter altered, amended or repealed in accordance with their terms and applicable law.

(c)     The shares of Target Bank common stock, $20.00 par value per share ("Target Bank Common Stock") and the shares of Acquirer Bank common stock, no par value per share ("Acquirer Bank Common Stock"), shall be treated as follows at the Effective Time: (i) each share of Target Bank Common Stock issued and outstanding immediately prior to the Effective Time shall be automatically canceled without consideration and cease to be an issued and outstanding share of Target Bank Common Stock; and (ii) each share of Acquirer Bank Common Stock issued and outstanding immediately prior to the Effective Time shall remain issued and outstanding.

4.     Directors and Officers of the Surviving Bank. The directors and officers of Acquirer Bank shall be the directors and officers of the Surviving Bank without change in title or authority, but subject to the authority and power of the board of directors and the sole stockholder of the Surviving Bank to add directors or officers to, or otherwise modify, the board of directors or number, titles and authority of the officers of the Surviving Bank.

5.     Procurement of Approvals. This Bank Merger Agreement shall be subject to the approval of BBCN, as the sole stockholder of Acquirer Bank, and Foster, as the sole stockholder of Target Bank, at meetings to be called and held or by consent in lieu thereof in accordance with the applicable provisions of law and their respective organizational documents. Acquirer Bank and Target Bank shall use their commercially reasonable best efforts to proceed expeditiously and cooperate fully in the procurement of any other consents and approvals and in the taking of any other action, and the satisfaction of all other requirements prescribed by applicable law or otherwise necessary for the consummation of the Bank Merger on the terms provided herein, including, without limitation, the preparation and submission of such applications or other filings for approval of the Bank Merger as may be required by applicable laws and regulations.

6.     Conditions Precedent. The obligations of the Parties under this Bank Merger Agreement shall be subject to: (a) the approvals of this Bank Merger Agreement by BBCN, as

the sole stockholder of Acquirer Bank, and by Foster, as the sole stockholder of Target Bank, at meetings duly called and held or by consent or consents in lieu thereof, in each case without any exercise of such dissenters' rights as may be applicable; (b) receipt of approval of the Bank Merger from all governmental and banking authorities whose approval is required by applicable laws and regulations; and (c) the consummation of the Merger pursuant to the Holding Company Merger Agreement at or before the Effective Time.

7.     <u>General Provisions</u>.

(a)     <u>Termination and Agreement</u>. The obligations of the Parties to effect the Bank Merger shall be subject to all the terms and conditions contained in the Holding Company Merger Agreement. This Bank Merger Agreement shall terminate, without any further action of any Party, notwithstanding stockholder approval, in the event that the Holding Company Merger Agreement shall be terminated as provided therein prior to the Effective Time.

(b)     <u>Amendment</u>. This Bank Merger Agreement may not be amended, modified or supplemented except by an instrument in writing signed on behalf of each of the Parties at any time prior to the Effective Time.

(c)     <u>Successors and Assigns</u>. This Bank Merger Agreement shall be binding upon and enforceable by the Parties and their respective successors and permitted assigns, but this Bank Merger Agreement may not be assigned by any Party, by operation of law or otherwise, without the prior written consent of the other Party.

(d)     <u>Governing Law</u>. This Bank Merger Agreement shall be governed by and construed in accordance with the laws of the State of California (without giving effect to choice of law principles thereof).

(e)     <u>Counterparts</u>. This Bank Merger Agreement may be executed in counterparts (which counterparts may be delivered by facsimile or other commonly used electronic means), each of which shall be considered one and the same agreement and shall become effective when both counterparts have been signed by each of the Parties and delivered to the other Party, it being understood that both Parties need not sign the same counterpart.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Parties have caused this Bank Merger Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

BBCN Bank

By: _____
Name: Soo Bong Min
Title: President and Chief Executive Officer

By: _____
Name: Juliet Stone
Title: Secretary

Foster Bank

By: _____
Name: Paul B. Kim
Title: President

By: _____
Name: Kurt C. Felde
Title: Secretary

*Signature Page to Agreement of Bank Merger*

IN WITNESS WHEREOF, the Parties have caused this Bank Merger Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

BBCN Bank

By: _____
Name: Soo Bong Min
Title: President and Chief Executive Officer

By: _____
Name: Juliet Stone
Title: Secretary

Foster Bank

By: _____
Name: Paul B. Kim
Title: President

By: _____
Name: Kurt C. Felde
Title: Secretary

IN WITNESS WHEREOF, the Parties have caused this Bank Merger Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

BBCN Bank

By: _____
Name: Soo Bong Min
Title: President and Chief Executive Officer

By: _____
Name: Juliet Stone
Title: Secretary

Foster Bank

By: _____
Name: Paul B. Kim
Title: President

By: _____
Name: Kurt C. Felde
Title: Secretary

*Signature Page to Agreement of Bank Merger*

IN WITNESS WHEREOF, the Parties have caused this Bank Merger Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

BBCN Bank

By: _____
           Name: Soo Bong Min
           Title: President and Chief Executive Officer

By: _____
           Name: Juliet Stone
           Title: Secretary


Foster Bank

By: _____
           Name: Paul B. Kim
           Title: President

By: _____
           Name: Kurt C. Felde
           Title: Secretary

*Signature Page to Agreement of Bank Merger*

A07868896

1338540 SUN

APPROVED
July 25, 2016
Jan Lynn Owen
Commissioner of
Business Oversight

By *Wallace M. Wong*
Wallace M. Wong
Senior Counsel

**FILED**
Secretary of State
State of California

JUL 29 2016

## AGREEMENT OF BANK MERGER

THIS AGREEMENT OF BANK MERGER, dated as of July 25, 2016 (this "Bank Merger Agreement"), is entered into between Wilshire Bank, a California state-chartered bank and a wholly owned subsidiary of Wilshire Bancorp, Inc., a California corporation ("WIBC"), and BBCN Bank, a California state-chartered bank and a wholly owned subsidiary of BBCN Bancorp, Inc., a Delaware corporation ("BBCN"). Wilshire Bank and BBCN Bank are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

WHEREAS, WIBC and BBCN entered into an Agreement and Plan of Merger, dated as of December 7, 2015 (the "Agreement"), providing, among other things, for the merger of WIBC with and into BBCN, with BBCN surviving (the "Merger");

WHEREAS, in connection with the Merger, WIBC and BBCN desire to merge Wilshire Bank with and into BBCN Bank (the "Bank Merger") concurrently with or as soon as reasonably practicable after the consummation of the Merger upon the terms and subject to the conditions set forth in this Bank Merger Agreement and the Agreement; and

WHEREAS, for federal and, if applicable, state and local income tax purposes, the Parties intend that the Bank Merger shall qualify as a "reorganization" under Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and this Agreement, shall constitute a "plan of reorganization" within the meaning of the Code.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Bank Merger Agreement and the Agreement, subject to the conditions set forth in this Bank Merger Agreement and the Agreement, and intending to be legally bound hereby, the Parties agree as follows:

1. Effective Time. Upon the terms and subject to the conditions set forth in this Bank Merger Agreement and the Agreement, concurrently with or as soon as reasonably practicable after the consummation of the Merger, Wilshire Bank and BBCN Bank shall cause the Bank Merger to be consummated by filing a copy of this Bank Merger Agreement, certified by the Secretary of State of the State of California pursuant to Section 1103 of the California General Corporation Law (the "CGCL"), with the Commissioner of Business Oversight of the State of California pursuant to Section 4887 of the California Financial Code (the "CFC"). The Bank Merger shall become effective at the close of business at 5:02 pm Pacific Daylight Time on the date of such filing (the "Effective Time").

2. The Merger. BBCN Bank shall be the surviving bank in the Bank Merger (the "Surviving Bank"). At the Effective Time, Wilshire Bank shall be merged with and into BBCN Bank and the separate existence of Wilshire Bank shall cease. The Bank Merger shall be governed by, and shall have the effects set forth in, the CGCL and the CFC.

la-1304419

**FILED**
5:02 p.m. Pacific Time
July 29, 2016
Jan Lynn Owen
Commissioner of Business Oversight
State of California.

By *Wallace M. Wong*
Wallace M. Wong
Senior Counsel

A0786896

3.      Effects of the Merger.

(a)      At the Effective Time, Article One of the Articles of Incorporation of BBCN Bank, as amended, shall be amended in its entirety to read as follows:

"ARTICLE ONE. NAME: The name of this Corporation is Bank of Hope."

(b)      . At the Effective Time, the Surviving Bank shall succeed, without other transfer, to all the rights and properties, and shall be subject to all the debts and liabilities, of Wilshire Bank, and the separate existence of BBCN Bank, with all its purposes, objects, rights, powers, privileges, liabilities, obligations and franchises, shall continue unaffected and unimpaired by the Bank Merger.

(c)      The Articles of Incorporation (as amended effective as of the Effective Time to reflect the new name of the Surviving Bank pursuant to Section 3(a)) and the Bylaws of BBCN Bank, as in effect as of the Effective Time, shall be the Articles of Incorporation and Bylaws of the Surviving Bank, until thereafter altered, amended or repealed in accordance with their terms and applicable law.

(d)      The shares of BBCN Bank common stock, no par value per share ("BBCN Bank Common Stock") and the shares of Wilshire Bank common stock, no par value per share ("Wilshire Bank Common Stock") shall be treated as follows at the Effective Time: (i) each share of BBCN Bank Common Stock issued and outstanding immediately prior to the Effective Time shall remain an issued and outstanding share of BBCN Bank Common Stock; and (ii) each share of Wilshire Bank Common Stock issued and outstanding immediately prior to the Effective Time shall be automatically canceled by operation of law without consideration and cease to be an issued and outstanding share of Wilshire Bank Common Stock.

4.      Directors and Officers of the Surviving Bank.  On or prior to the Effective Time, BBCN Bank shall cause the number of directors that shall comprise the board of directors of the Surviving Bank at the Effective Time to be 16.  Of the members of the initial board of directors of the Surviving Bank at the Effective Time, nine (9) shall be current members of the board of directors of BBCN Bank as designated by BBCN Bank prior to the Effective Time, and seven (7) shall be current members of the board of directors of Wilshire Bank as designated by Wilshire Bank prior to the Effective Time.

5.      Procurement of Approvals.  This Bank Merger Agreement shall be subject to the approval of WIBC, as the sole shareholder of Wilshire Bank, and BBCN, as the sole shareholder of BBCN Bank, at meetings to be called and held or by consent in lieu thereof in accordance with the applicable provisions of law and their respective organizational documents.  Wilshire Bank and BBCN Bank shall use their commercially reasonable best efforts to proceed expeditiously and cooperate fully in the procurement of any other consents and approvals and in the taking of any other action, and the satisfaction of all other requirements prescribed by applicable law or otherwise necessary for the consummation of the Bank Merger on the terms provided herein, including, without limitation, the preparation and submission of such applications or other filings for approval of the Bank Merger as may be required by applicable laws and regulations.

A0786895

6.      Conditions Precedent. The obligations of the Parties under this Bank Merger Agreement shall be subject to: (a) the approvals of this Bank Merger Agreement by WIBC, as the sole shareholder of Wilshire Bank, and BBCN, as the sole shareholder of BBCN Bank, at meetings duly called and held or by consent or consents in lieu thereof, in each case without any exercise of such dissenters' rights as may be applicable; (b) receipt of approval of the Bank Merger from all governmental and banking authorities whose approval is required by applicable laws and regulations; and (c) the consummation of the Merger pursuant to the Agreement at or before the Effective Time.

7.      General Provisions.

(a)      Termination and Agreement. The obligations of the Parties to effect the Bank Merger shall be subject to all the terms and conditions contained in the Agreement. This Bank Merger Agreement shall terminate, without any further action of any Party, notwithstanding shareholder approval, in the event that the Agreement shall be terminated as provided therein prior to the Effective Time.

(b)      Amendment. This Bank Merger Agreement may not be amended, modified or supplemented except by an instrument in writing signed on behalf of each of the Parties at any time prior to the Effective Time.

(c)      Successors and Assigns. This Bank Merger Agreement shall be binding upon and enforceable by the Parties and their respective successors and permitted assigns, but this Bank Merger Agreement may not be assigned by any Party, by operation of law or otherwise, without the prior written consent of the other Party.

(d)      Governing Law. This Bank Merger Agreement shall be governed by and construed in accordance with the laws of the State of California (without giving effect to choice of law principles thereof).

(e)      Counterparts. This Bank Merger Agreement may be executed in counterparts (which counterparts may be delivered by facsimile or other commonly used electronic means), each of which shall be considered one and the same agreement and shall become effective when both counterparts have been signed by each of the Parties and delivered to the other Party, it being understood that both Parties need not sign the same counterpart.

[Remainder of this page intentionally left blank]

A0786896

IN WITNESS WHEREOF, Wilshire Bank and BBCN Bank have caused this Bank Merger Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first set forth above.

WILSHIRE BANK

By: _____

Name: Jae Whan Yoo
Title: President & Chief Executive Officer

By: _____

Name: Lisa K. Pai
Title: Secretary


BBCN BANK

By: _____

Name: Kevin S. Kim
Title: President & Chief Executive Officer


By: _____

Name: David W. Kim
Title: Secretary

[Signature Page to Agreement of Bank Merger]

la-1304419

A0786896

IN WITNESS WHEREOF, Wilshire Bank and BBCN Bank have caused this Bank Merger Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first set forth above.

**WILSHIRE BANK**

By: _____
Name:  Jae Whan Yoo
Title:  President & Chief Executive Officer

By: _____
Name:  Lisa K. Pai
Title:  Secretary

**BBCN BANK**

By: _____
Name:  Kevin S. Kim
Title:  President & Chief Executive Officer

By: _____
Name:  David W. Kim
Title:  Secretary

[Signature Page to Agreement of Bank Merger]

la-1304419

# Exhibit B



U.S. Small Business Administration

# NOTE

| SBA Loan # | 50768050-05 |
|---|---|
| SBA Loan Name | ILLINOIS CARPET & DRAPERY, INC. |
| Date | FEBRUARY 27, 2012 |
| Loan Amount | 950,000.00 |
| Interest Rate | PRIME + 2.00% |
| Borrower | ILLINOIS CARPET & DRAPERY, INC. <br> KYUWON LEE AND MICHA LEE |
| Operating Company | ILLINOIS CARPET & DRAPERY, INC. |
| Lender | Foster Bank |

1. PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of

***************************NINE HUNDRED FIFTY THOUSAND AND NO/100********************* _____ Dollars,

interest on the unpaid principal balance, and all other amounts required by this Note.

2. DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

3. PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate on this Note will fluctuate. The initial interest rate is 5.25% per year. This initial rate is the prime rate in effect on the first business day of the month in which SBA received the loan application, plus 2.00%. The initial interest rate must remain in effect until the first change period begins unless reduced in accordance with SOP 50 10.

Borrower must pay principal and interest payment of $6,230.00 every month, beginning one month from the month this Note is dated; payments must be made on twenty seventh calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted monthly (the "change period").

The "Prime Rate" is the prime rate in effect on the first business day of the month (as published in a national financial newspaper or website) in which SBA received the application, or any interest rate change occurs. Base Rates will be rounded to two decimal places with 0.004 being rounded down and 0.005 being rounded up.

The adjusted interest rate will be 2.00% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The spread as identified in the Note may not be changed during the life of the Loan without the written agreement of the Borrower.

For variable rate loans, the interest rate adjustment period may not be changed without the written consent of the borrower.

Lender must adjust the payment amount at least annually as needed to amortized principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

Loan Prepayment:

Notwithstanding any provision in this Note to the contrary:

Borrower may prepay this Note. Borrower may prepay 20% or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20% and the Loan has been sold on the secondary market, Borrower must:

a.Give Lender written notice;

b.Pay all accrued interest; and

c.If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal

**SBA 147:  Note Page 2 Continuation**

Continuation of "..."

to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

Subsidy Recoupment Fee. When in any one of the first three years from the date of initial disbursement Borrower voluntarily prepays more than 25% of the outstanding principal balance of the loan, Borrower must pay to Lender on behalf of SBA a prepayment fee for that year as follow:

a.During the first year after the date on which the loan is first disbursed, 5% of the total prepayment amount;

b.During the second year after the date on which the loan is first disbursed, 3% of the total prepayment amount; and

c.During the third year after the date on which the loan is first disbursed, 1% of the total prepayment amount.

All remaining principal and accrued interest is due and payable 21 years from date of Note.

Late Charge:  If a payment on this Note is more than 15 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

The "Prime Rate" is the prime rate in effect on the first business day of the month (as published in the Wall Street Journal) in which SBA received the application, or any interest rate change occurs.

Bankers Systems, Inc., St. Cloud, MN

4. DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A. Fails to do anything required by this Note and other Loan Documents;

B. Defaults on any other loan with Lender;

C. Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D. Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

E. Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

F. Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G. Fails to pay any taxes when due;

H. Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I. Has a receiver or liquidator appointed for any part of their business or property;

J. Makes an assignment for the benefit of creditors;

K. Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L. Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

M. Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5. LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A. Require immediate payment of all amounts owing under this Note;

B. Collect all amounts owing from any Borrower or Guarantor;

C. File suit and obtain judgment;

D. Take possession of any Collateral; or

E. Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6. LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A. Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B. Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C. Release anyone obligated to pay this Note;

D. Compromise, release, renew, extend or substitute any of the Collateral; and

E. Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7. WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8. SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9. GENERAL PROVISIONS:

A. All individuals and entities signing this Note are jointly and severally liable.

B. Borrower waives all suretyship defenses.

C. Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D. Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E. Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F. If any part of this Note is unenforceable, all other parts remain in effect.

G. To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10. STATE-SPECIFIC PROVISIONS:



11. BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

ILLINOIS CARPET & DRAPERY, INC.

KYUWON LEE AND MICHA LEE

| | |
|---|---|
| X | 2/27/2012 |

KYUWON LEE, PRESIDENT

| | |
|---|---|
| X | 2/27/2012 |

MICHA LEE, SECRETARY

| | |
|---|---|
| X | 2/27/2012 |

KYUWON LEE

| | |
|---|---|
| X | 2/27/2012 |

MICHA LEE

# Exhibit C

# Illinois Anti-Predatory Lending Database Program

## Certificate of Exemption

Doc#: 1207416057 Fee: $78.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 03/14/2012 12:59 PM Pg: 1 of 21

**Report Mortgage Fraud**
**800-532-8785**

---

The property identified as: **PIN:** 09-20-203-016-0000

**Address:**
**Street:** 984 Lee Street
**Street line 2:**
**City:** Des Plaines **State:** IL **ZIP Code:** 60016

**Lender:** Foster Bank

**Borrower:** Illinois Carpet & Drapery, Inc and Kyuwon Lee and Micha Lee

**Loan / Mortgage Amount:** $950,000.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is commercial property.

**Certificate number:** 6E8F8870-818C-48E0-8672-E18A1BB6A38D    **Execution date:** 02/27/2012

This instrument was prepared by:
Foster Bank/Loan#200308000001
5005 NEWPORT DRIVE
ROLLING MEADOWS, IL 60008

When recorded return to (name, address):

Foster Bank/Soo Jin Kang
5005 NEWPORT DRIVE
ROLLING MEADOWS, IL 60008

——————— State of Illinois ——————— Space Above This Line For Recording Data ———————

# REAL ESTATE MORTGAGE
### (With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is _____ 02-27-2012 _____ and the parties, their addresses and tax identification numbers, if required, are as follows:

   MORTGAGOR:  KYU WON LEE and MICHA LEE, As Joint Tenants
   984 Lee Street
   Des Plaines, IL 60016

   ☒ If checked, refer to the attached Addendum incorporated herein, for additional Mortgagors, their signatures and acknowledgments.

   LENDER:  Foster Bank
   Organized and existing under the laws of the state of Illinois
   5005 NEWPORT DRIVE
   ROLLING MEADOWS, IL 60008

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Mortgagor's performance under this Security Instrument, Mortgagor grants, bargains, sells, conveys, mortgages and warrants to Lender the following described property:
   See Attached legal description as "Exhibit A"

   The property is located in Cook _____ at 984 Lee Street _____
   _____ (County) _____
   _____, Des Plaines _____, Illinois 60016 _____
   (Address)                    (City)                              (Zip Code)

   Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers, all water and riparian rights, wells, ditches, reservoirs, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

3. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
   A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. *(When referencing the debts below it is suggested that you include items such as borrowers' names, note amounts, interest rates, maturity dates, etc.)*
   See Attached "Exhibit B" a copy of the promissory Note which secured by this Mortgage

ILLINOIS- AGRICULTURAL/COMMERCIAL REAL ESTATE SECURITY INSTRUMENT (NOT FOR FNMA, FHLMC, FHA OR VA USE, AND NOT FOR CONSUMER PURPOSES)                    *(page 1 of 8)*

Experi™  ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IL 12/27/2002

B. All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt existing now or executed after this Security Instrument whether or not this Security Instrument is specifically referenced. If more than one person signs this Security Instrument, each Mortgagor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

C. All obligations Mortgagor owes to Lender, which now exist or may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.

D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

This Security Instrument will not secure any other debt if Lender fails to give any required notice of the right of rescission.

4. **PAYMENTS.** Mortgagor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

5. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:
   A. To make all payments when due and to perform or comply with all covenants.

   B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.

   C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

6. **CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

7. **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Security Instrument is released.

8. **TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Lender may demand immediate payment if:
   A. A beneficial interest in Mortgagor is sold or transferred.

   B. There is a change in either the identity or number of members of a partnership or similar entity.

   C. There is a change in ownership of more than 25 percent of the voting stock of a corporation or similar entity.

However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Security Instrument.

9. **ENTITY WARRANTIES AND REPRESENTATIONS.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Mortgagor makes to Lender the following warranties and representations which shall continue as long as the Secured Debt remains outstanding:

   A. Mortgagor is duly organized and validly existing in Mortgagor's state of incorporation or organization. Mortgagor is in good standing in all states in which Mortgagor transacts business. Mortgagor has the power and authority to own the Property and to carry on its business as now being conducted and, as applicable, is qualified to do so in each state in which Mortgagor operates.

   B. The execution, delivery and performance of this Security Instrument by Mortgagor and the obligations evidenced by the Secured Debt are within the power of Mortgagor, have been duly authorized, have received all

*(page 2 of 8)*

necessary governmental approval, and will not violate any provision of law, or order of court or governmental agency.

C. Other than previously disclosed in writing to Lender, Mortgagor has not changed its name within the last ten years and has not used any other trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve its existing name, trade names and franchises until the Secured Debt is satisfied.

10. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor shall not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor, and of any loss or damage to the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument. Mortgagor shall not partition or subdivide the Property without Lender's prior written consent.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

11. **AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

12. **ASSIGNMENT OF LEASES AND RENTS.** Mortgagor assigns, grants, bargains, conveys, mortgages and warrants to Lender as additional security all the right, title and interest in the following (Property).
   A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including but not limited to, any extensions, renewals, modifications or replacements (Leases).
   B. Rents, issues and profits, including but not limited to, security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Mortgagor may have that in any way pertain to or are on account of the use or occupancy of the whole or any part of the Property (Rents).

In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement.

Mortgagor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default. Mortgagor will not collect in advance any Rents due in future lease periods, unless Mortgagor first obtains Lender's written consent. Upon default, Mortgagor will receive any Rents in trust for Lender and Mortgagor will not commingle the Rents with any other funds. When Lender so directs, Mortgagor will endorse and deliver any payments of Rents from the Property to Lender. Amounts collected will be applied at Lender's discretion to the Secured Debts, the costs of managing, protecting and preserving the Property, and other necessary expenses. Mortgagor agrees that this Security Instrument is immediately effective between Mortgagor and Lender and effective as to third parties on the recording of this Assignment.

As long as this Assignment is in effect, Mortgagor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants. Mortgagor, at its sole cost and expense, will keep, observe and perform, and require all other parties to the Leases to comply with the Leases and any applicable law. If Mortgagor or any party to the Lease defaults or fails to observe any applicable law, Mortgagor will promptly notify Lender. If Mortgagor neglects or refuses to enforce compliance with the terms of the Leases, then Lender may, at Lender's option, enforce compliance.

Mortgagor will not sublet, modify, extend, cancel, or otherwise alter the Leases, or accept the surrender of the Property covered by the Leases (unless the Leases so require) without Lender's consent. Mortgagor will not assign,

Expere™ ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IL 12/27/2002

compromise, subordinate or encumber the Leases and Rents without Lender's prior written consent. Lender does not assume or become liable for the Property's maintenance, depreciation, or other losses or damages when Lender acts to manage, protect or preserve the Property, except for losses and damages due to Lender's gross negligence or intentional torts. Otherwise, Mortgagor will indemnify Lender and hold Lender harmless for all liability, loss or damage that Lender may incur when Lender opts to exercise any of its remedies against any party obligated under the Leases.

13. **LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Mortgagor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

14. **DEFAULT.** Mortgagor will be in default if any of the following occur:
   A. Any party obligated on the Secured Debt fails to make payment when due;

   B. A breach of any term or covenant in this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt;

   C. The making or furnishing of any verbal or written representation, statement or warranty to Lender that is false or incorrect in any material respect by Mortgagor or any person or entity obligated on the Secured Debt;

   D. The death, dissolution, or insolvency of, appointment of a receiver for, or application of any debtor relief law to, Mortgagor or any other person or entity obligated on the Secured Debt;

   E. A good faith belief by Lender at any time that Lender is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment is impaired or the value of the Property is impaired;

   F. A material adverse change in Mortgagor's business including ownership, management, and financial conditions, which Lender in its opinion believes impairs the value of the Property or repayment of the Secured Debt; or

   G. Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

15. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Mortgagor is in default. Upon default, Lender shall have the right, without declaring the whole indebtedness due and payable, to foreclose against all or part of the Property and shall have the right to possession provided by law. This Security Instrument shall continue as a lien on any part of the Property not sold on foreclosure.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents. All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

16. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Security Instrument. Mortgagor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Mortgagor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. This Security Instrument shall remain in effect until released. Lender agrees to pay for any recordation costs of such release.

17. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means all federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:
   A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

*(page 4 of 8)*

Experͬͤ © 1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IL 12/27/2002

B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

D. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are and shall remain in full compliance with any applicable Environmental Law and Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

E. Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

F. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

G. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

H. Lender may perform any of Mortgagor's obligations under this section at Mortgagor's expense.

I. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Security Instrument and in return Mortgagor will provide Lender with collateral of at least equal value to the Property secured by this Security Instrument without prejudice to any of Lender's rights under this Security Instrument.

J. Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section shall survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

18. **CONDEMNATION.** Mortgagor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

19. **INSURANCE.** Mortgagor agrees to maintain insurance as follows:

A. Mortgagor shall keep the Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Mortgagor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Mortgagor.

Express ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IL 12/27/2002

Unless otherwise agreed in writing, all insurance proceeds shall be applied to restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of scheduled payment nor change the amount of any payment. Any excess will be paid to the Mortgagor. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

B. Mortgagor agrees to maintain comprehensive general liability insurance naming Lender as an additional insured in an amount acceptable to Lender, insuring against claims arising from any accident or occurrence in or on the Property.

C. Mortgagor agrees to maintain rental loss or business interruption insurance, as required by Lender, in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing), under a form of policy acceptable to Lender.

20. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

21. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and Lender's lien status on the Property.

22. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Mortgagor signs this Security Instrument but does not sign an evidence of debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Mortgagor and Lender.

23. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

24. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one mortgagor will be deemed to be notice to all mortgagors.

25. **WAIVERS.** Except to the extent prohibited by law, Mortgagor hereby waives and releases any and all rights and remedies Mortgagor may now have or acquire in the future relating to the right of homestead exemption, redemption, reinstatement, appraisement, the marshalling of liens and assets and all other exemptions as to the Property.

26. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ _950,000.00_ . This limitation of amount does not include interest, attorneys fees, and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

27. **U.C.C. PROVISIONS.** If checked, the following are applicable to, but do not limit, this Security Instrument:

☐ **Construction Loan.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

☐ **Fixture Filing.** Mortgagor grants to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property.

☐ **Crops; Timber; Minerals; Rents, Issues and Profits.** Mortgagor grants to Lender a security interest in all crops, timber and minerals located on the Property as well as all rents, issues, and profits of them including, but not limited to, all Conservation Reserve Program (CRP) and Payment in Kind (PIK) payments and similar governmental programs (all of which shall also be included in the term "Property").

*(page 6 of 8)*

Experte© ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IL 12/27/2002

☐ **Personal Property.** Mortgagor grants to Lender a security interest in all personal property located on or connected with the Property, including all farm products, inventory, equipment, accounts, documents, instruments, chattel paper, general intangibles, and all other items of personal property Mortgagor owns now or in the future and that are used or useful in the construction, ownership, operation, management, or maintenance of the Property (all of which shall also be included in the term "Property"). The term "personal property" specifically excludes that property described as "household goods" secured in connection with a "consumer" loan as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices.

☐ **Filing As Financing Statement.** Mortgagor agrees and acknowledges that this Security Instrument also suffices as a financing statement and any carbon, photographic or other reproduction may be filed of record for purposes of Article 9 of the Uniform Commercial Code.

**28. OTHER TERMS.** If checked, the following are applicable to this Security Instrument:

☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

☒ **Separate Assignment.** The Mortgagor has executed or will execute a separate assignment of leases and rents. If the separate assignment of leases and rents is properly executed and recorded, then the separate assignment will supersede this Security Instrument's "Assignment of Leases and Rents" section.

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Mortgagor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

Entity Name: _____

_____     _____
(Signature) KYU WON LEE     (Date)     (Signature) MICHA LEE     (Date)

_____     _____
(Signature)     (Date)     (Signature)     (Date)

**ACKNOWLEDGMENT:**

    STATE OF Illinois _____, COUNTY OF _____ } ss.

(Individual)     This instrument was acknowledged before me this _____27th_____ day of _____ February, 2012

    by KYU WON LEE; MICHA LEE, As Joint Tenants _____ .

    My commission expires: 5/6/2015

_____
(Notary Public)

KYUNG LEE
MY COMMISSION EXPIRES
MAY 6, 2015
NOTARY PUBLIC OFFICIAL SEAL STATE OF ILLINOIS

STATE OF _____ , COUNTY OF _____ } ss.

**(Business or Entity Acknowledgment)** This instrument was acknowledged before me this _____ day of _____

by _____

_____ (Title(s))

of _____ (Name of Business or Entity)

a _____ on behalf of the business or entity.

My commission expires:

_____
(Notary Public)

Experï™ ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IL  12/27/2002

| Debtor Name and Address | Lender Name and Address | Loan Description |
|---|---|---|
| KYU WON LEE and MICHA LEE<br>5 LEXINGTON ROAD<br>SOUTH BARRINGTON, IL 60010 | Foster Bank<br>5005 NEWPORT DRIVE<br>ROLLING MEADOWS, IL 60008 | Number 200308000001<br>Amount $<br>Date 02-27-2012<br>(Loan) |

☐ If checked, refer to the attached Addendum incorporated herein for additional Debtors and their signatures.

## Small Business Administration
## Lien Instrument Addendum

This Small Business Administration Lien Instrument Addendum (Addendum) is incorporated into, amends and supplements the terms of the __Mortgage__ (Lien Instrument) dated __02-27-2012__ between the Debtor and Lender, which secures a Loan from Lender to __KYU WON LEE; MICHA LEE__ .

This Addendum is executed for the purpose of including additional terms required by the Small Business Administration. Where inconsistent with the terms of the Lien Instrument, the terms of this Addendum shall prevail.

**SBA GUARANTIED LOAN.** The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

a) When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b) Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower, Debtor or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

Small Business Administration Lien Instrument Addendum
VMP® Bankers Systems™
Wolters Kluwer Financial Services © 2002, 2010

SBA-ADD 6/15/2010
Page 1 of 2

**SIGNATURES.** By signing, Debtor agrees to the terms contained in this Addendum, and acknowledges receipt of a copy of this Addendum.

**DEBTOR:**

KYU WON LEE

MICHA LEE

**LENDER:**

Foster Bank

Tae Gil Lee
Loan Officer

| Debtor Name and Address | Lender Name and Address | Loan Description |
|---|---|---|
| ILLINOIS CARPET & DRAPERY, INC.<br>984 LEE STREET<br>DES PLAINES, IL 60016 | Foster Bank<br>5005 NEWPORT DRIVE<br>ROLLING MEADOWS, IL 60008 | Number 200308000001<br>Amount $<br>Date 02-27-2012<br>(Loan) |

☐ If checked, refer to the attached Addendum incorporated herein for additional Debtors and their signatures.

## Small Business Administration
## Lien Instrument Addendum

This Small Business Administration Lien Instrument Addendum (Addendum) is incorporated into, amends and supplements the terms of the Mortgage _____ (Lien Instrument) dated 02-27-2012 _____ between the Debtor and Lender, which secures a Loan from Lender to KYU WON LEE; MICHA LEE _____ .

This Addendum is executed for the purpose of including additional terms required by the Small Business Administration. Where inconsistent with the terms of the Lien Instrument, the terms of this Addendum shall prevail.

**SBA GUARANTIED LOAN.** The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

a) When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b) Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower, Debtor or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

Small Business Administration Lien Instrument Addendum
VMP® Bankers Systems™
Wolters Kluwer Financial Services © 2002, 2010

**SIGNATURES.** By signing, Debtor agrees to the terms contained in this Addendum, and acknowledges receipt of a copy of this Addendum.

**DEBTOR:**

ILLINOIS CARPET & DRAPERY, INC.

KYUWON LEE
PRESIDENT

MICHA LEE
SECRETARY

**LENDER:**

Foster Bank

Tae Gil Lee
Loan Officer

## "EXHIBIT A"

PARCEL 1:
LOT 7 IN BLOCK 5 IN PARSON AND LEE'S ADDITION TO DES PLAINES, BLOCKS OF THE
NORTHEAST 1/4 OF SECTION 20, TOWNSHIP 41 NORTH, RANGE 12, EAST OF THE THIRD
PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PARCEL 2:
LOT 1 IN HARD ROCK SUBDIVISION, BLOCKS OF THE SOUTHERLY 50 FEET OF LOT 5 AND ALL
OF LOT 6 IN BLOCK 5 IN PARSON AND LEE'S ADDITION TO DES PLAINES, BLOCKS OF THE
NORTHEAST 1/4 OF SECTION 20, TOWNSHIP 41 NORTH, RANGE 12, EAST OF THE THIRD
PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED AUGUST 15, 2002 AS
DOCUMENT NUMBER 0020897803, IN COOK COUNTY, ILLINOIS.

Commonly Known As: 984 Lee Street, Des Plaines, IL 60016

Permanent Index No.: 09-20-203-016-0000, 09-20-203-017-0000, 09-20-203-018-0000
            And 09-20-203-031-0000



Doc#: 1207416058 Fee: $58.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 03/14/2012 12:59 PM Pg: 1 of 11

——————— State of Illinois ——————— Space Above This Line For Recording Data ———————

This instrument was prepared by (name, address): Foster Bank/Loan#200308000001
5005 NEWPORT DRIVE  ROLLING MEADOWS, IL  60008
When recorded return to (name, address): Foster Bank/Soo Jin Kang
5005 NEWPORT DRIVE  ROLLING MEADOWS, IL  60008

# ASSIGNMENT OF LEASES AND RENTS

1. **DATE AND PARTIES.** The date of this Assignment of Leases and Rents (Assignment) is
_____02-27-2012_____ . The parties and their addresses are:

   **ASSIGNOR:** KYU WON LEE and MICHA LEE, As Joint Tenants
   984 Lee Street
   Des Plaines, IL  60016

   ☒ Refer to the Addendum that is attached and incorporated herein for additional Assignors.

   **LENDER:**  Foster Bank
   Organized and existing under the laws of the state of Illinois
   5005 NEWPORT DRIVE
   ROLLING MEADOWS, IL  60008

2. **ASSIGNMENT OF LEASES AND RENTS.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debts and Assignor's performance under this Assignment, Assignor irrevocably assigns, grants, bargains, conveys, mortgages and warrants to Lender as additional security all the right, title and interest in the following (all referred to as Property).

   A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including any extensions, renewals, modifications or replacements (all referred to as Leases).

   B. Rents, issues and profits (all referred to as Rents), including but not limited to security deposits, minimum rent, percentage rent, additional rent, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Assignor may have that in any way pertain to or are on account of the use or occupancy of the whole or any part of the Property.

   C. The term Property as used in this Assignment shall include the following described real property: See Attached legal description as "Exhibit A"

The Property is located in _____ Cook _____ County at
_____ 984 Lee Street, Des Plaines, IL 60016 _____ (Address, City, State,
ZIP Code).

In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be
regarded as a security agreement.

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Assignment at any one time will not
exceed $ 950,000.00 _____ . This limitation of amount does not include interest, attorneys' fees and other
fees and charges validly made pursuant to this Assignment. Also, this limitation does not apply to advances made
under the terms of this Assignment to protect Lender's security and to perform any of the covenants contained in this
Assignment.

4. **SECURED DEBTS.** This Assignment will secure the following Secured Debts:
    A. ☒ **Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements.
    (Include items such as borrowers' names, note amounts, interest rates, maturity dates, etc.)

    ☐ One or more of the debts secured by this Assignment contains a future advance provision.
    B. ☐ **All Debts.** All present and future debts from Assignor and _____
    _____
    to Lender, even if this Assignment is not specifically referenced or if the future debt is unrelated to or of a
    different type than this debt. If more than one person signs this Assignment, each agrees that it will secure
    debts incurred either individually or with others who may not sign this Assignment. Nothing in this Assignment
    constitutes a commitment to make additional or future loans or advances. Any such commitment must be in
    writing. In the event that Lender fails to provide notice of the right of rescission, Lender waives any subsequent
    security interest in the Assignor's principal dwelling that is created by this Assignment. This Assignment will
    not secure any debt for which a non-possessory, non-purchase money security interest is created in "household
    goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and
    deceptive credit practices. This Assignment will not secure any debt for which a security interest is created in
    "margin stock" and Lender does not obtain a "statement of purpose," as defined and required by federal law
    governing securities.

    C. **Sums Advanced.** All sums advanced and expenses incurred by Lender under the terms of this Assignment.

5. **PAYMENTS.** Assignor agrees that all payments under the Secured Debts will be paid when due and in accordance
    with the terms of the Secured Debts and this Assignment.

6. **COLLECTION OF RENTS.** Assignor may collect, receive, enjoy and use the Rents so long as Assignor is not in default.
    Assignor will not collect in advance any Rents due in future lease periods, unless Assignor first obtains Lender's
    written consent. Upon default, Assignor will receive any Rents in trust for Lender and Assignor will not commingle the
    Rents with any other funds. When Lender so directs, Assignor will endorse and deliver any payments of Rents from
    the Property to Lender. Amounts collected will be applied at Lender's discretion to the Secured Debts, the costs of
    managing, protecting and preserving the Property, and other necessary expenses. Assignor agrees that this
    Assignment is immediately effective between Assignor and Lender and effective as to third parties on the recording of
    this Assignment.

7. **WARRANTIES AND REPRESENTATIONS.** To induce Lender to enter into the Loan, Assignor makes these
    representations and warranties for as long as this Assignment is in effect.
    A. **Power.** Assignor is duly organized, validly existing and in good standing under the laws in the jurisdiction where
    Assignor was organized and is duly qualified, validly existing and in good standing in all jurisdictions in which

*(page 2 of 7)*

Expere™ ©2001 Bankers Systems, Inc., St. Cloud, MN Form ASMT-RENT-IL 2/24/2002

Assignor operates or Assignor owns or leases property. Assignor has the power and authority to enter into this transaction and to carry on Assignor's business or activity as now conducted.

B. **Authority.** The execution, delivery and performance of this Assignment and the obligation evidenced by this Assignment: are within Assignor's duly authorized powers; has received all necessary governmental approval; will not violate any provision of law or order of court or governmental agency; and will not violate any agreement to which Assignor is a party or to which Assignor is or any of Assignor's property is subject.

C. **Name and Place of Business.** Other than previously disclosed in writing to Lender, Assignor has not changed Assignor's name or principal place of business within the last ten years and has not used any other trade or fictitious name. Without Lender's prior written consent, Assignor does not and will not use any other name and will preserve Assignor's existing name, trade names and franchises.

D. **Ownership or Lease of Property.** Assignor owns or leases all property that Assignor needs to conduct Assignor's business and activities. All of Assignor's property is free and clear of all liens, security interests, encumbrances and other adverse claims and interests, except those Lender previously agreed to in writing.

E. **Compliance with Laws.** Assignor is not violating any laws, regulations, rules, orders, judgments or decrees applicable to Assignor or Assignor's property, except for those that Assignor is challenging in good faith through proper proceedings after providing adequate reserves to fully pay the claim and its challenge should Assignor lose.

F. **Title.** Assignor has good title to the Leases, Rents and Property and the right to assign, grant, bargain, convey, mortgage and warrant to Lender as additional security the Leases and Rents, and no other person has any right in the Leases and Rents.

G. **Recordation.** Assignor has recorded the Leases as required by law or as otherwise prudent for the type and use of the Property.

H. **Default.** No default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants. Assignor, at its sole cost and expense, will keep, observe and perform, and require all other parties to the Leases to comply with the Leases and any applicable law. If Assignor or any party to the Lease defaults or fails to observe any applicable law, Assignor will promptly notify Lender.

I. **Lease Modification.** Assignor has not sublet, modified, extended, canceled, or otherwise altered the Leases, or accepted the surrender of the Property covered by the Leases (unless the Leases so required).

J. **Encumbrance.** Assignor has not assigned, compromised, subordinated or encumbered the Leases and Rents.

8. **COVENANTS.** Assignor agrees to the following covenants:

A. **Rent Abatement and Insurance.** When any Lease provides for an abatement of Rents due to fire, flood or other casualty, Assignor will insure against this risk of loss with a policy satisfactory to Lender. Assignor may choose the insurance company, subject to Lender's approval, which will not be unreasonably withheld.

B. **Copies of Leases.** Assignor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed.

C. **Right to Rents.** Immediately after the execution of this Assignment, Assignor will notify all current and future tenants and others obligated under the Leases of Lender's right to the Leases and Rents, and will request that they immediately pay all future Rents directly to Lender when Assignor or Lender asks them to do so.

D. **Accounting.** When Lender requests, Assignor will provide to Lender an accounting of Rents, prepared in a form acceptable to Lender, subject to generally accepted accounting principles and certified by Assignor or Assignor's accountant to be current, accurate and complete as of the date requested by Lender.

E. **Lease Modification.** Assignor will not sublet, modify, extend, cancel, or otherwise alter the Leases, or accept the surrender of the Property covered by the Leases (unless the Leases so required) without Lender's written consent.

F. **Encumbrance.** Assignor will not assign, compromise, subordinate or encumber the Leases and Rents without Lender's prior written consent.

G. **Future Leases.** Assignor will not enter into any future Leases without prior written consent from Lender. Assignor will execute and deliver such further assurances and assignments as to these future Leases as Lender requires from time to time.

H. **Personal Property.** Assignor will not sell or remove any personal property on the Property, unless Assignor replaces this personal property with like kind for the same or better value.

I. **Prosecution and Defense of Claims.** Assignor will appear in and prosecute its claims or defend its title to the Leases and Rents against any claims that would impair Assignor's interest under this Assignment and, on Lender's request, Assignor will also appear in any action or proceeding on behalf of Lender. Assignor agrees to assign to Lender, as requested by Lender, any right, claims or defenses which Assignor may have against parties who supply labor or materials to improve or maintain the leaseholds subject to the Leases and/or the Property.

J. **Liability and Indemnification.** Lender does not assume or become liable for the Property's maintenance, depreciation, or other losses or damages when Lender acts to manage, protect or preserve the Property, except for losses or damages due to Lender's gross negligence or intentional torts to the extent permitted by law. Otherwise, Assignor will indemnify Lender and hold Lender harmless for all liability, loss or damage that Lender may incur when Lender opts to exercise any of its remedies against any party obligated under the Leases.

K. **Leasehold Estate.** Assignor will not cause or permit the leasehold estate under the Leases to merge with Assignor's reversionary interest, and agrees that the Leases shall remain in full force and effect regardless of any merger of the Assignor's interests and of any merger of the interests of Assignor and any party obligated under the Leases.

*(page 3 of 7)*

Experi,™ ©2001 Bankers Systems, Inc., St. Cloud, MN Form ASMT-RENT-IL 2/24/2002

L. **Insolvency.** Lender will be the creditor of each tenant and of anyone else obligated under the Leases who is subject to an assignment for the benefit of creditors, an insolvency, a dissolution or a receivership proceeding, or a bankruptcy.

9. **TRANSFER OF AN INTEREST IN THE ASSIGNOR.** If Assignor is an entity other than a natural person (such as a corporation or other organization), Lender may demand immediate payment if:
A. A beneficial interest in Assignor is sold or transferred.
B. There is a change in either the identity or number of members of a partnership or similar entity.
C. There is a change in ownership of more than 25 percent of the voting stock of a corporation or similar entity.
However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Assignment.

10. **DEFAULT.** Assignor will be in default if any of the following occur with regard to the Secured Debts that are secured by this Assignment:
A. **Payments.** Assignor fails to make a payment in full when due.
B. **Insolvency or Bankruptcy.** Assignor makes an assignment for the benefit of creditors or becomes insolvent, either because Assignor's liabilities exceed Assignor's assets or Assignor is unable to pay Assignor's debts as they become due; or Assignor petitions for protection under federal, state or local bankruptcy, insolvency or debtor relief laws, or is the subject of a petition or action under such laws and fails to have the petition or action dismissed within a reasonable period of time not to exceed 60 days.
C. **Death or Incompetency.** If Assignor is an individual, Assignor dies or is declared legally incompetent.
D. **Business Termination.** If Assignor is not an individual, Assignor merges, dissolves, reorganizes or ends its business or existence, or a partner or majority owner dies or is declared legally incompetent.
E. **Failure to Perform.** Assignor fails to perform any condition or to keep any promise or covenant of this Assignment, any other document evidencing or pertaining to the Loan, or any other debt or agreement Assignor has with Lender.
F. **Misrepresentation.** Assignor makes any verbal or written statement or provides any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.
G. **Property Transfer.** Assignor transfers all or a substantial part of Assignor's money or property.
H. **Property Value.** The value of the Property declines or is impaired.
I. **Name Change.** Assignor changes Assignor's name or assumes an additional name without notifying Lender before making such a change.
J. **Material Change.** Without first notifying Lender, there is a material change in Assignor's business, including ownership, management, and financial conditions.
K. **Insecurity.** Lender reasonably believes that Lender is insecure.

11. **REMEDIES.** After Assignor defaults, and after Lender gives any legally required notice and opportunity to cure the default, Lender may at Lender's option do any one or more of the following:
A. **Acceleration.** Lender may make all or any part of the amount owing by the terms of the Secured Debts immediately due.
B. **Additional Security.** Lender may demand additional security or additional parties to be obligated to pay the Secured Debts.
C. **Sources.** Lender may use any and all remedies Lender has under the state law where the Property is located or federal law or in any instrument evidencing or pertaining to the Secured Debts.
D. **Insurance Benefits.** Lender may make a claim for any and all insurance benefits or refunds that may be available on Assignor's default.
E. **Payments Made On Assignor's Behalf.** Amounts advanced on Assignor's behalf will be immediately due and may be added to the Secured Debts.
F. **Rents.** Lender may terminate Assignor's right to collect Rents and directly collect and retain Rents in Lender's name without taking possession of the Property and to demand, collect, receive, and sue for the Rents, giving proper receipts and releases. In addition, after deducting all reasonable expenses of collection from any collected and retained Rents, Lender may apply the balance as provided for by the Secured Debts.
G. **Entry.** Lender may enter, take possession, manage and operate all or any part of the Property; make, modify, enforce or cancel or accept the surrender of any Leases; obtain or evict any tenants and licensees; increase or reduce Rents; decorate, clean and make repairs or do any other act or incur any other cost Lender deems proper to protect the Property as fully as Assignor could do. Any funds collected from the operation of the Property may be applied in such order as Lender may deem proper, including, but not limited to, payment of the following: operating expenses, management, brokerage, attorneys' and accountants' fees, the Secured Debts, and toward the maintenance of reserves for repair or replacement. Lender may take such action without regard to the adequacy of the security, with or without any action or proceeding, through any person or agent, or receiver to be appointed by a court, and irrespective of Assignor's possession. The collection and application of the Rents or the entry upon and taking possession of the Property as set out in this section shall not cure or waive any notice of default under the Secured Debts, this Assignment, or invalidate any act pursuant to such notice. The enforcement of such remedy by Lender, once exercised, shall continue for so long as Lender shall elect, notwithstanding that such collection and application of Rents may have cured the original default.

H. **Waiver.** Except as otherwise required by law, by choosing any one or more of these remedies you do not give up any other remedy. You do not waive a default if you choose not to use a remedy. By electing not to use any remedy, you do not waive your right to later consider the event a default and to use any remedies if the default continues or occurs again.

12. **APPOINTMENT OF A RECEIVER.** On or after an Assignor's default, Assignor agrees to Lender making an application to the court for an appointment of a receiver for the benefit of Lender to take possession of the Property and the Leases, with the power to receive, collect and apply the Rents. Any Rents collected will be applied as the court authorizes to pay taxes, to provide insurance, to make repairs and to pay costs or any other expenses relating to the Property, the Leases and Rents, and any remaining sums shall be applied to the Secured Debts. Assignor agrees that this appointment of a receiver may be without giving bond, without reference to the then-existing value of the Property, and without regard to the insolvency of any person liable for any of the Secured Debts.

13. **COLLECTION EXPENSES AND ATTORNEYS' FEES.** To the extent permitted by law, Assignor agrees to pay all expenses of collection, enforcement or protection of Lender's rights and remedies under this Assignment. Unless the applicable law that governs this Assignment is North Dakota, expenses include, but are not limited to, reasonable attorneys' fees, court costs and other legal expenses. These expenses are due and payable immediately. These expenses will bear interest from the date of payment until paid in full at the contract interest rate then in effect for the Loan. To the extent permitted by the United States Bankruptcy Code, Assignor agrees to pay the reasonable attorneys' fees Lender incurs to collect this Assignment as awarded by any court exercising jurisdiction under the Bankruptcy Code.

14. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste," "hazardous substance," or "regulated substances" under any Environmental Law.

Assignor represents, warrants and agrees that:
A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.
B. Except as previously disclosed and acknowledged in writing to Lender, Assignor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.
C. Assignor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Assignor will take all necessary remedial action in accordance with Environmental Law.
D. Except as previously disclosed and acknowledged in writing to Lender, Assignor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Assignor or any tenant of any Environmental Law. Assignor will immediately notify Lender in writing as soon as Assignor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.
E. Except as previously disclosed and acknowledged in writing to Lender, Assignor and every tenant have been, are and will remain in full compliance with any applicable Environmental Law.
F. Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.
G. Assignor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.
H. Assignor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Assignor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Assignor agrees, at Assignor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Assignor's obligations under this section at Assignor's expense.

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Assignor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses to the extent permitted by law, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Assignment and in return Assignor will provide Lender with collateral of at least equal value to the Property secured by this Assignment without prejudice to any of Lender's rights under this Assignment.

L. Notwithstanding any of the language contained in this Assignment to the contrary, the terms of this section will survive any foreclosure or satisfaction of this Assignment regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

**15. TERM.** This Assignment will remain in full force and effect until the Secured Debts are paid or otherwise discharged and Lender is no longer obligated to advance funds under any loan or credit agreement which is a part of the Secured Debts. If any or all payments of the Secured Debts are subsequently invalidated, declared void or voidable, or set aside and are required to be repaid to a trustee, custodian, receiver or any other party under any bankruptcy act or other state or federal law, then the Secured Debts will be revived and will continue in full force and effect as if this payment had not been made.

**16. CO-SIGNERS.** If Assignor signs this Assignment but does not sign the Secured Debts, Assignor does so only to assign Assignor's interest in the Property to secure payment of the Secured Debts and Assignor does not agree to be personally liable on the Secured Debts. If this Assignment secures a guaranty between Lender and Assignor, Assignor agrees to waive any rights that may prevent Lender from bringing any action or claim against Assignor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws.

**17. WAIVERS.** Except to the extent prohibited by law, Assignor waives all appraisement and homestead exemption rights relating to the Property.

**18. U.C.C. PROVISIONS.**

☐ **Construction Loan.** This Assignment secures an obligation incurred for the construction of an improvement on the Property.

**19. OTHER TERMS.** If checked, the following are applicable to this Assignment:

☐ **Line of Credit.** The Secured Debts include a revolving line of credit provision. Although the Secured Debts may be reduced to a zero balance, this Assignment will remain in effect until the Secured Debts and all underlying agreements have been terminated in writing by Lender.

☐ **Additional Terms.**

**20. APPLICABLE LAW.** This Assignment is governed by the laws of Illinois, except to the extent otherwise required by the laws of the jurisdiction where the Property is located, and the United States of America.

**21. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Assignor's obligations under this Assignment are independent of the obligations of any other Assignor. Lender may sue each Assignor individually or together with any other Assignor. Lender may release any part of the Property and Assignor will still be obligated under this Assignment for the remaining Property. The duties and benefits of this Assignment will bind and benefit the successors and assigns of Lender and Assignor.

**22. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Assignment may not be amended or modified by oral agreement. No amendment or modification of this Assignment is effective unless made in writing and executed by Assignor and Lender. This Assignment is the complete and final expression of the agreement. If any provision of this Assignment is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**23. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Assignment.

**24. NOTICE, FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail and by registered or certified mail, return receipt requested, to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one party will be deemed to be notice to all parties. Assignor will inform Lender in writing of any change in Assignor's name, address or other application information. Assignor will provide Lender any financial statements or information Lender requests. All financial statements and information Assignor gives Lender will be correct and complete. Assignor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Assignor's obligations under this Assignment and to confirm Lender's lien status on any Property. Time is of the essence.

**25. SIGNATURES.** By signing, Assignor agrees to the terms and covenants contained in this Assignment. Assignor also acknowledges receipt of a copy of this Assignment.

(Entity Name)

(Signature)  KYU WON LEE

(Signature)  MICHA LEE

**ACKNOWLEDGMENT:**

(Individual)

STATE OF Illinois _____ , COUNTY OF _____ } ss.
This instrument was acknowledged before me this _____ 27th _____ day of _____ February, 2012 _____
by KYU WON LEE; MICHA LEE, As Joint Tenants _____ .
My commission expires: 5/6/2015

KYUNG LEE
OFFICIAL SEAL
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXPIRES
MAY 6, 2015

(Notary Public)

(Business or Entity Acknowledgment)

STATE OF _____ , COUNTY OF _____ } ss.
This instrument was acknowledged before me this _____ day of _____
by _____
_____ (Title(s))
of _____ (Name of Business or Entity)
a _____ on behalf of the business or entity.
My commission expires:

(Notary Public)

**"EXHIBIT A"**

PARCEL 1:
LOT 7 IN BLOCK 5 IN PARSON AND LEE'S ADDITION TO DES PLAINES, BLOCKS OF THE
NORTHEAST 1/4 OF SECTION 20, TOWNSHIP 41 NORTH, RANGE 12, EAST OF THE THIRD
PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PARCEL 2:
LOT 1 IN HARD ROCK SUBDIVISION, BLOCKS OF THE SOUTHERLY 50 FEET OF LOT 5 AND ALL
OF LOT 6 IN BLOCK 5 IN PARSON AND LEE'S ADDITION TO DES PLAINES, BLOCKS OF THE
NORTHEAST 1/4 OF SECTION 20, TOWNSHIP 41 NORTH, RANGE 12, EAST OF THE THIRD
PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED AUGUST 15, 2002 AS
DOCUMENT NUMBER 0020897803, IN COOK COUNTY, ILLINOIS.

Commonly Known As: 984 Lee Street, Des Plaines, IL 60016

Permanent Index No.: 09-20-203-016-0000, 09-20-203-017-0000, 09-20-203-018-0000
            And 09-20-203-031-0000